Donald J. Sullivan, Esq.
WSB # 5-1485
Sullivan Law Offices, P.C.
2103 Evans Ave.
Cheyenne, WY 82001
Attorney for Plaintiff

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2024 DEC 30  PM 3:36

MARGARET BOTKINS, CLERK
CHEYENNE

UNITED STATES DISTRICT COURT
DISTRICT OF WYOMING

| | |
|---|---|
| JILL KLAWONN, as the Wrongful Death Representative of JAMES A. SMITH, Deceased,<br><br>Plaintiff,<br><br>vs.<br><br>1. EDGEWOOD REAL ESTATE INVESTMENT TRUST, d/b/a EDGEWOOD REIT;<br>2. EDGEWOOD PROPERTIES MANAGEMENT LLC;<br>3. EDGEWOOD PROPERTIES LLLP;<br>4. EDGEWOOD OPCO LLC;<br>5. EDGEWOOD HEALTHCARE;<br>6. EDGEWOOD VISTA<br>7. EDGEWOOD MANAGEMENT GROUP LLC;<br>8. EVI ASPEN WIND LLC;<br>9. EVI SIERRA HILLS LLC;<br>10. EVI PARK PLACE LLC;<br>11. EVI MEADOW WIND LLC;<br>12. EVI LARAMIE LLC;<br>13. EMG CHEYENNE AW LLC;<br>14. EMG CHEYENNE SH LLC;<br>15. EMG CASPER PP LLC;<br>16. EMG CASPER MW LLC;<br>17. EMG LARAMIE LLC; and<br><br>18 - 67. OTHER EDGEWOOD ENTITIES, Real Names Presently Unknown,<br><br>Defendants. | Docket<br><br><br><br>COMPLAINT 24-CV-275-R |

Plaintiff, complaining against Defendants, alleges and shows the Court:

The Parties

1. Plaintiff is the court-appointed Wrongful Death Representative of James A. Smith, Deceased, pursuant to an Order of the District Court, First Judicial District Court, Laramie County, Wyoming, under Docket Number 2024-CV-0202240, signed and filed May 15, 2024. Plaintiff is, and at the time of her appointment as the Wrongful Death Representative was, and at all relevant times has been, a citizen of the State of Colorado.

2. Defendant EDGEWOOD REAL ESTATE INVESTMENT TRUST, d/b/a EDGEWOOD REIT is, and at all relevant times was, an entity organized under the laws of the State of North Dakota and having its offices and principal place at 51 Broadway North, Suite 600, Fargo, North Dakota, 58102. Whenever it is referred to herein individually, it will be described as as "Edgewood Defendant 1."

3. Defendant EDGEWOOD PROPERTIES MANAGEMENT LLC is, and at all relevant times was, an entity organized under the laws of the State of North Dakota and having its offices and principal place at 51 Broadway North, Suite 600, Fargo, North Dakota, 58102. Whenever it is referred to herein individually, it will be described as as "Edgewood Defendant 2."

4. Defendant EDGEWOOD PROPERTIES LLLP is, and at all relevant times was, an entity organized under the laws of the State of North Dakota and having its offices and principal place at 51 Broadway North, Suite 600, Fargo, North Dakota, 58102. Whenever it is referred to herein individually, it will be described as as "Edgewood Defendant 3."

5. Defendant EDGEWOOD OPCO LLC is, and at all relevant times was, an entity organized under the laws of the State of North Dakota and having its offices and principal

place at 402 Demers Ave., Suite 200, Grand Forks, North Dakota, 58201. Whenever it is referred to herein individually, it will be described as as "Edgewood Defendant 4."

6. Defendant EDGEWOOD HEALTHCARE is, and at all relevant times was, an entity organized under the laws of the State of North Dakota and having its offices and principal place at 402 Demers Ave., Suite 200, Grand Forks, North Dakota, 58201. Whenever it is referred to herein individually, it will be described as as "Edgewood Defendant 5."

7. Defendant EDGEWOOD VISTA MANAGEMENT, INC., is, and at all relevant times was, an entity organized under the laws of the State of North Dakota and having its offices and principal place at 322 Demers Ave., Suite 300, Grand Forks, North Dakota, 58201. Whenever it is referred to herein individually, it will be described as as "Edgewood Defendant 6."

8. Defendant EDGEWOOD MANAGEMENT GROUP LLC is, and at all relevant times was, an entity organized under the laws of the State of North Dakota and having its offices and principal place at 402 Demers Ave., Suite 200, Grand Forks, North Dakota, 58201. Whenever it is referred to herein individually, it will be described as as "Edgewood Defendant 7."

9. Defendant EVI ASPEN WIND LLC is, and at all relevant times was, an entity organized under the laws of the State of North Dakota and having its offices and principal place at 51 Broadway North, Suite 600, Fargo, North Dakota, 58102. Whenever is referred herein individually, it will be described as as "Edgewood Defendant 8."

10. Defendant EVI SIERRA HILLS LLC is, and at all relevant times was, an entity organized under the laws of the State of North Dakota and having its offices and principal place at 51 Broadway North, Suite 600, Fargo, North Dakota, 58102. Whenever it is

referred to herein individually, it will be described as as "Edgewood Defendant 9."

11. Defendant EVI PARK PLACE LLC is, and at all relevant times was, an entity organized under the laws of the State of North Dakota and having its offices and principal place at 51 Broadway North, Suite 600, Fargo, North Dakota, 58102. Whenever is referred herein individually, it will be described as as "Edgewood Defendant 10."

12. Defendant EVI MEADOW WIND LLC is, and at all relevant times was, an entity organized under the laws of the State of North Dakota and having its offices and principal place at 51 Broadway North, Suite 600, Fargo, North Dakota, 58102. Whenever is referred herein individually, it will be described as as "Edgewood Defendant 11."

13. Defendant EVI LARAMIE LLC is, and at all relevant times was, an entity organized under the laws of the State of North Dakota and having its offices and principal place at 51 Broadway North, Suite 600, Fargo, North Dakota, 58102. Whenever is referred herein individually, it will be described as as "Edgewood Defendant 12."

14. Defendant EMG CHEYENNE AW LLC is, and at all relevant times was, an entity organized under the laws of the State of North Dakota and having its offices and principal place at 402 Demers Ave., Suite 200, Grand Forks, North Dakota, 58201. Whenever is referred herein individually, it will be described as as "Edgewood Defendant 13."

15. Defendant EMG CHEYENNE SH LLC is, and at all relevant times was, an entity organized under the laws of the State of North Dakota and having its offices and principal place at 402 Demers Ave., Suite 200, Grand Forks, North Dakota, 58201. Whenever is referred herein individually, it will be described as as "Edgewood Defendant 14."

16. Defendant EMG CASPER PP LLC is, and at all relevant times was, an entity organized under 402 Demers Ave., Suite 200, Grand Forks, North Dakota, 58201.

Whenever is referred herein individually, it will be described as as "Edgewood Defendant 15."

17. Defendant EMG CASPER MW LLC is, and at all relevant times was, an entity organized under the laws of the State of North Dakota and having its offices and principal place at 402 Demers Ave., Suite 200, Grand Forks, North Dakota, 58201. Whenever is referred herein individually, it will be described as as "Edgewood Defendant 16."

18. Defendant EMG LARAMIE LLC is, and at all relevant times was, an entity organized under the laws of the State of North Dakota and having its offices and principal place at 402 Demers Ave., Suite 200, Grand Forks, North Dakota, 58201. Whenever is referred herein individually, it will be described as as "Edgewood Defendant 17."

19. Upon information and belief, Defendants 18 through 67 are other Edgewood entities whose real names are presently unknown to Plaintiff; Plaintiff will seek the Court's approval to identify these other Edgewood entities by amendment to the Complaint as they are identified in discovery.

20. For simplicity and for organizational clarity, Plaintiff will use the term "the Edgewood Defendants" throughout this Complaint to refer to all Defendants jointly, individually and collectively. By this term Plaintiff includes each and every individual Defendant named above, and the entire, collective entity.

21. Upon information and belief, the Edgewood Defendants constitute one single entity which acts and conducts business as one organized and unified whole. Upon information and belief each individual Defendant is an integral part of the whole, and the actions of each individual Defendant are taken pursuant to the collective interest of the single entity, of which each is a constituent part.

22. Upon information and belief, each individual named Defendant and the collective entity designated here as the Edgewood Defendants does now, and at all relevant times did, conduct business and the activities of the entity at various locations in the State of Wyoming, including in Cheyenne, Laramie County, Wyoming.

23. Each Defendant is a citizen of a State other than Colorado. There exists complete diversity of citizenship between Plaintiff and all Defendants. The amount in controversy exceeds seventy five thousand dollars. This Court has diversity jurisdiction over this matter pursuant to 28 USC 1332.

24. The professional relationship between the Edgewood Defendants and Plaintiff's Decedent arose within the State of Wyoming, and in Cheyenne, Laramie County, Wyoming. The written contract by which the Collective Defendant Edgewood undertook to provide highly specialized professional care to Plaintiff's Decedent was signed and entered into within the State of Wyoming, and in Cheyenne, Laramie County, Wyoming. The acts and omissions of Defendants which give rise to this action occurred and were committed within the State of Wyoming, and in Cheyenne, Laramie County, Wyoming. Venue is proper in this Court pursuant to 28 USC 1391.

Factual Basis of the Claims

25. In the fall and winter of 2023, Plaintiff's Decedent James Smith was eighty-six years old, and was in exceptionally good physical health for a man of his age. He enjoyed a close and loving relationship with his twin adult daughters, with his son in law, and with his grandson. For many years he lived alone, and subsequently he lived with one of his twin adult daughters and her family.

26. Mr. Smith developed significant deficits in his memory and his ability to manage his own care and upkeep, to such an extent that he needed a greater level of care than his

twin adult daughters were able to provide for him. In due course his family accepted the necessity to provide him with professional nursing home care at a level that was appropriate for his needs.

27. Mr. Smith became a resident of a nursing home ("Nursing Home One") in Cheyenne and resided there successfully for a period of time. Over time, Nursing Home One recognized that Mr. Smith tended to become lost, to wander away, and in effect to depart from the protective environs of "Nursing Home One" and become lost, frequently leaving the grounds of the nursing home property due to his inability to maintain his understanding of his location or return to his place of residence under his own control.

28. "Nursing Home One" recognized that Mr. Smith's mental facilities had become such that his own basic safety required a greater level of care and attention than they could provide to him. "Nursing Home One" met with Mr. Smiths twin adult daughters and discussed the situation with them in a clear, honest, and forthright manner. "Nursing Home One" advised Mr. Smith's family to secure a place for him in a specialized facility which could provide properly for Mr. Smith's safety needs, especially including his tendency to escape and to wander away. In the business of the nursing home industry such a facility is referred to as "Lock Down Memory Unit."

29. Mr. Smith's family, including Plaintiff, researched the availability of an appropriate nursing home with an appropriate Lock Down Memory Unit in or near Cheyenne. They learned that Defendant Edgewood operated a nursing home in Cheyenne, using the trade name "Aspen Wind," and they contacted that business to inquire into its suitability as the caregiver for Mr. Smith.

30. Upon information and belief the Edgewood Defendants requested and obtained information about Mr. Smith from multiple sources and about his physical health; his tendency to become lost and to wander away; his experience at "Nursing Home One;"

and the critical importance of maintaining him safely in a secure, locked-down specialty unit.

31. The Edgewood Defendants sent one or more representatives to meet and evaluate Mr. Smith himself, ostensibly to determine the appropriateness of Mr. Smith being entrusted to the Edgewood Defendants and their Lock Down Memory Unit in Cheyenne at its Aspen Wind business location.

32. The Edgewood Defendants do, and at all relevant times did, hold themselves and their "Aspen Wind" business location out to the public, and to Plaintiff's Decedent and his family, as a specialized nursing home facility with the specialized, enhanced capacity to maintain careful control of its patients and residents, who by definition are known to it and intended by it to be in the class of persons at the specific risk of wandering away.

33. After obtaining and evaluating all the information it required or desired, the Edgewood Defendants met with Mr. Smith's family and advised them that Defendant Edgewood and its business operation at Aspen Wind was specifically and precisely suited for the safe and proper care and maintenance of Mr. Smith, with special focus on his need to be protected against the known risk of wandering.

34. Mr. Smith's family trusted the Edgewood Defendants and their representatives who evaluated Mr. Smith and his suitabilty as a patient-resident at Defendant Edgewood's Aspen Wind business location.

35. The Edgewood Defendants presented their form contract for Lock Down Memory Unit nursing home care and services to Mr. Smith's family, and the family signed the Defendant Edgewood contract for the benefit of Mr. Smith and paid the requisite fee for services for his first month of care by the Edgewood Defendants, which was approximately eleven thousand dollars ($11,000.00) per month for the specialized care Mr.

Smith required.

36. The Edgewood Defendants assigned a specific patient-resident room to Mr. Smith, and made the room available to his family so that his own, familiar furniture and personal effects could be moved into his room at Aspen Wind to be immediately available upon his arrival.

37. The Edgewood Defendants designated a specific date and time for Mr. Smith to enter into their Aspen Wind operation, and provided information and guidance to his family for relocating him to Defendant Edgewood's Aspen Wind operation.

38. The Edgewood Defendants designated December 20, 2023, as the date for Mr. Smith to come under the care, protection, and safety of Defendant's Lock Down Memory Unit at Aspen Wind.

39. On the date and at the time the Edgewood Defendants designated for Mr. Smith to move in, his family brought him to the facility. Mr. Smith and his family met some of the staff members then on duty at Aspen Wind, and he was introduced to his room inside the Lock Down Memory Unit at Aspen Wind.

40. After a few hours of helping Mr. Smith get settled in, watch his favorite television programs, and the like, the family members began the process of taking their leave for the day. The last family member hugged him goodbye, promised to come to see him the next day, and departed roughly around five o'clock on December 20, 2023.

41. At approximately nine o'clock on the night of December 20, 2023, Mr. Smith's family received a phone call from the Cheyenne Police Department, informing them that Mr. Smith was in the Emergency Room at Cheyenne Regional Medical Center.

42. The Cheyenne Police advised the Smith family that Mr. Smith had been struck and severely injured by a vehicle traveling fast on a highway at a point approximately one mile from the Edgewood Defendants Aspen Wind and its secure Lock Down Memory Unit.

43. Mr. Smith died at CRMC in the early hours of December 21, 2023.

44. Mr. Smith was struck and fatally injured by a car traveling on a highway immediately adjacent to Aspen Wind, a few hours after he first became a protected patient and resident inside the secure Lock Down Memory Unit operated by the Edgewood Defendants.

45. At each and every relevant time, date, and moment, the Edgewood Defendants knew and understood that their Lock Down Memory Unit inside their Aspen Wood operation would be, and eventually was, located proximately to a roadway which carried traffic traveling in the range of 40 to 50 mph at all hours of the day and night. At each point in time, the Edgewood Defendants knew that the high-speedway roadway in the immediate vicinity of their Aspen Wind operation posed a major and significant to the life and limb of the particular class and category of nursing home residents with memory deficits and the identified risk of becoming lost and wandering helplessly.

46. Upon information and belief, the Edgewood Defendants have arranged their commercial and business affairs in a manner calculated and designed to allow the individuals who exert control over the collective combined entity to assign, move, transfer, and otherwise use the assets and personnel of the various entities (the Edgewood Defendants in this action) from one to another and yet another, for the shared purpose of funneling money and profits to the ultimate beneficial owners of the collective enterprise at the cost of depriving the "customers" - the patient-residents whose care and well-being rightly ought to be the highest goal and concern - of the very care and assistance which the Edgewood Defendants did and do routinely promise them.

47. Upon information and belief, the Edgewood Defendants do and did have, do and did maintain, and in fact did and do exercise firm control over every aspect of the operations and activities of each of the constituent entities. Upon information and belief the Edgewood Defendants avail themselves of a myriad of shell entities throughout a great many States of the United States, all similarly set up to assure the greatest flow of money and profits to the ultimate owners, who are upon information and belief associated with the "real estate investment trust" at the top of the Edgewood pyramid.

48. The Edgewood Defendants named in this action are those with the greatest relationship to and control over the nursing home businesses operated in five separate locations in Wyoming alone, all within the greater Edgewood empire. Upon information and belief, the dozens of similar Edgewood entities doing business in dozens of other locations in other States function in a substantially similar manner, but those entities are not directly involved in the facts giving rise to this action.

49. Upon information and belief, the Edgewood Defendants did and do conduct their affairs without fidelity to the legal requirements necessary to allow them to take advantage of their corporate and other legal entity formal structures. Upon information and belief they act in a manner indicative of misuse of the several formal legal structures behind which they have set up their multiple business fronts. Upon information and belief the Edgewood Defendants use the various corporate and other legal entities by which they operate as mere shells, instrumentalities or conduits of each other, all to such an extreme extent that these entities, and each and all of them, are in reality the alter egos of one another, such that the court should and in fairness must permit the piercing of the structural veils of the several entities to hold them, and each and all of them, jointly liable for the harm they caused to James Smith.

First Cause of Action

50. Plaintiff reiterates each allegation made above as though set forth in full.

51. The Edgewood Defendants negligently failed to provide all, and indeed failed to provide any, of the specialized care which their patient and resident, James A. Smith, needed and required, and which they specifically knew he required.

52. The negligence of the Edgewood Defendants included, without limitation:

a. Failure to establish and maintain a safe and secure system for confining and managing their residents who were at high risk of wandering away;

b. Failure to provide and maintain sufficient numbers of qualified staff to meet adequately the specific and known needs of the special population which they undertook to care for safely and properly.

c. Failure to train their staff adequately on the specialized needs of the unique patient-resident population which they undertook to care for in their "special locked down memory unit;"

d. Failure to install, maintain, operate, and utilize an appropriate electronic security system to protect their patient-residents from the known high risk of wandering away;

e. Failure to provide their patient-residents with an appropriate system of identification to facilitate staff awareness of which persons were patient-residents and which persons were simply family members, friends, and others who might be on the premises;

f. Failure to segregate the general public from the patient-residents who were, and were known by the Edgewood Defendants to be, at high risk of wandering away; and

g. Other and general negligence in the premises.

53. The negligence of the Edgewood Defendants was a proximate cause of Mr. Smith's wandering away from the Edgewood premises which were supposed to protect him, and especially to protect him for the known high risk of wandering away.

54. The negligence of the Edgewood Defendants was a proximate cause of Mr. Smith's being on the nearby highway and being struck in the dark by a vehicle driving at highway speed along that highway.

55. The negligence of the Edgewood Defendants was a proximate cause of Mr. Smith's being injured, and of his death.

## Second Cause of Action

56. Plaintiff reiterates each allegation made above as though set forth in full.

57. The Edgewood Defendants made specific representations to Mr. Smith, through his family including to this Plaintiff. The Edgewood Defendants represented, among other things, that:

    a) They were experienced and uniquely qualified to provide the high level of safety-conscious nursing home care which Mr. Smith required, particularly with respect to the known tendency to wander away;

    b) They were equipped and prepared in all respects to provide the high level of safety-conscious nursing home care which Mr. Smith required, particularly with respect to the known tendency to wander away;

    c) Their business operation in Cheyenne, using the trade and advertising name of "Aspen Wind," was fully equipped, staffed, and prepared to provide this high level of specialized care;

    d) They had examined and evaluated Mr. Smith and understood his unique and particular needs for this high level of specialized care;

e) They understood that Mr. Smith's family was seeking a care facility that fully met his needs for specialized, high-level care, and that the Smith family was willing and able to meet the Edgewood Defendants' high costs commensurate with the high level of care he and the other patient-residents in similar circumstances needed, day in and day out.

58. Upon information and belief the representations and statements made by the Edgewood Defendants to Plaintiff and the Smith family were false when made, and were made for the specific purpose of inducing the Smith family to entrust Mr. Smith to the Edgewood Defendants, even in the face of the substantially higher-than-usual costs for the Edgewood care at Aspen Wind.

59. Plaintiff and the Smith family trusted the statements and representations made to them by the Edgewood Defendants, and relied on the truth and veracity of the Edgewood Defendants' statements in deciding to entrust Mr. Smith to the Edgewood Defendants and their Aspen Wind operation.

60. The trust and reliance placed by Plaintiff and the Smith family in the Edgewood Defendants and the representations made by the Edgewood Defendants were reasonable in the circumstances.

61. The false statements and representations made by the Edgewood Defendants proximately caused his injuries and his resulting death.

Third Cause of Action

62. Plaintiff reiterates each allegation made above as though set forth in full.

63. The Edgewood Defendants entered into a contract with Mr. Smith and his family whereby it promised to provide a high level of safety protection and care for Mr. Smith, specifically to provide him appropriate nursing home care and to take the necessary safety measures to protect him from his known tendency to wander away.

64. The Edgewood Defendants breached their contract and, rather than provide the high level of safety and care which they had promised, instead they abandoned him as soon as he came into their care.

65. The breach of their contract by the Edgewood Defendants was not the result of a single omission or oversight. Rather, it was the result of the wholesale and calculated custom and practice of these Defendants to ignore entirely the promises and assurances they had undertaken.

66. The Edgewood Defendants' breach of their special contract of care was willing, deliberate, and intentional.

67. The Edgewood Defendants' breach of their contract was a proximate cause of Mr. Smith's injuries and his resulting death.

## Exemplary Damages

68. Plaintiff reiterates each allegation made above as though set forth in full.

69. As described in the *ad damnum* clause below, Plaintiff does seek general and special damages against the Edgewood Defendants for their misconduct.

70. Upon the unique and aggravated facts of this case, Plaintiff further seeks exemplary damages, in such amount as the finder of fact may determine to be appropriate.

71. Exemplary damages are appropriate where the evidence at trial demonstrates that the harm caused was not the result of simple oversight, or momentary lapse of attention, but rather was the product of calculated choices made by a wrongdoer in disregard of known circumstances. Exemplary damages are especially appropriate where, as in this case, the wrongdoing was committed as part and parcel of a commercial scheme to generate profits at the particularly peril of a person to whom a Defendant owed - or, in this case, affirmatively took on for financial gain - a special duty of care and fidelity. Exemplary damages are uniquely appropriate where, as here, the wrongdoer had actual knowledge of the weakness or dependent status of the person he promises to protect, and affirmatively boasts of his own unique fitness to provide the care needed, and then abandons the protected from the outset.

72. Exemplary damages are provided in the law in those unique circumstances where the facts of the case make it clear to the trier of fact that the wrongdoer must be sanctioned with significant financial costs simply to cause the wrongdoer, in the future, to keep its promises to the special needs of the very persons it promises to protect.

WHEREFORE Plaintiff demands general and special damages in such amount as the trier of fact determines to be appropriate to the persons who have been harmed by the wrongful death of James A. Smith; and further demands the imposition of exemplary damages in such amount as the trier of fact determines to be sufficient to induce the Defendant wrongdoers, and others similarly situated, not to engage in the misconduct which the evidence at trial will reveal by these Defendants; all together with the costs of this action, and such other and further relief as may be appropriate under the law and the facts proven at trial.

DATED this 30th Day of December, 2024

                        JILL KLAWONN, as the Wrongful Death
                        Representative of JAMES A. SMITH,
                        Deceased, Plaintiff, by:

                        _____
                        Donald J. Sullivan, Esq.
                        WSB # 5-1485
                        Sullivan Law Offices, P.C.
                        2103 Evans Ave.
                        Cheyenne, WY 82001
                        Attorney for Plaintiff